ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IX

| | | |
|---|---|---|
| ORLANDO CORTÉS PÉREZ<br><br>QUERELLANTES-<br>RECURRIDO<br><br>V.<br><br>#01 AUTO SALES, INC.<br><br>QUERELLADOS-<br>RECURRENTE | TA2026RA00082 | *REVISIÓN DE DECISIONES ADMINISTRATIVAS* procedente del Departamento de Asuntos al Consumidor<br><br>Caso Núm.:<br>May-2024-0005077<br><br>Sobre:<br>Compraventa de Vehículos de Motor |

Panel integrado por su presidenta, la juez Brignoni Mártir, el juez Salgado Schwarz, y la juez Aldebol Mora

**Brignoni Mártir, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de abril de 2026.

Comparece ante nos, #1 Auto Sales, Inc., (en adelante, "Auto Sales"). Solicita nuestra intervención para que dejemos sin efecto la *"Resolución"* emitida el 29 de enero de 2026 y notificada al siguiente día, por el Departamento de Asuntos del Consumidor ("DACo"). Mediante esta, DACo declaró *Ha Lugar* la *"Querella"* presentada por el señor Orlando Cortés Pérez (en adelante, "el recurrido"). En consecuencia, le ordenó a Auto Sales que reparara el motor del automóvil en disputa; que indemnizara al recurrido en la cantidad total de $11,339.00; más el interés legal; y cargos por demora en caso de que se retrase la ejecución de la reparación ordenada.

Por los fundamentos que expondremos a continuación, *confirmamos* la *"Resolución"* recurrida.

**I.**

El día 26 de marzo de 2024, el recurrido presentó la *"Querella"* de epígrafe ante el DACo. A través de esta, indicó que el 3 de febrero de 2024, adquirió un vehículo de motor en el dealer Grupo Castillo Auto. No obstante, sostuvo que al mes siguiente de efectuada la compra el referido

vehículo comenzó a manifestar "ruidos extraños" en el área del motor. Indicó, que el Dealer fue notificado de los aparentes desperfectos mecánicos, pero no proveyó solución alguna. Ante estos hechos, solicitó como remedio la reparación del automóvil o que se ordenara la devolución de éste.

El 18 de junio de 2024, el recurrido enmendó la *"Querella"* a los fines de solicitar que Auto Sales H/N/C Grupo Castillo Auto, le provea un vehículo de motor a través del cual pueda trasladarse mientras el vehículo en controversia se esté reparando. Además, solicitó que se le ordene a Auto Sales que le rembolse el dinero que ha gastado en la renta de un automóvil. A su vez, aclaró que el remedio principal que solicita es la terminación de la relación contractual y la devolución de lo pagado por el vehículo y su reparación.

En respuesta a la *"Querella,"* Auto Sales admitió que el vehículo de motor en cuestión fue adquirido en el Dealer Grupo Castillo Auto y que el recurrido alegó que el automóvil presenta daños en el motor. De otra parte, sostuvo como defensa afirmativa que el vehículo no tiene desperfectos mecánicos y que de tenerlos son reparables y Auto Sales está dispuesto a repararlos. De igual modo, aseveró que los aducidos desperfectos no están cubiertos por la garantía.

Así las cosas, el 4 de febrero de 2025, el Inspector vehicular de DACo realizó una inspección al vehículo objeto de litigio. Posteriormente, notificó un *"Informe de Inspección."* Mediante este, indicó la siguiente observación: "buñuelo o muñequita desgastado en el cigüeñal. Este desgaste fue por falta del laminado del fluido lubricante del motor estando en frio." A su vez, concluyó que las posibles causas de lo anterior podrían ser:

1. Uso del vehículo indebido cuando este tiene mezcla de "coolant y aceite" en la cual rasga el Buñuelo o Muñequita del cigüeñal.

2. Si el motor estando en receso de un día para el otro, si lo prenden llevándolo a una aceleración de extremas revoluciones haciendo un "W.O.T. Wide Open Trotter" puede causar dicha avería en el cigüeñal. El fluido lubricante no está a su temperatura ideal.

Las partes presentaron mociones en las que impugnaron el Informe preparado. El recurrido sostuvo que el Informe adolece de ser uno incompleto. Por su parte, Auto Sales objetó la terminología utilizada en el Informe y las posibles causas del desperfecto mecánico dado que estas alegadamente provocan confusión. Por otro lado, Auto Sales también presentó un Informe Pericial. A través de este, el Técnico Automotriz contratado por Auto Sales, indicó que el vehículo presentaba un desgaste excesivo en el punto número cinco (5) del cigüeñal. Además, expuso que el "desgaste excesivo encontrado guarda relación con el ruido indicado por el querellante." Finalmente, el Técnico concluyó que el "desgaste encontrado y/o daño según mi experiencia se debe a que el motor sufrió un sobre giro excesivo, mal uso."

La vista administrativa de este caso se celebró los días 10 y 22 de octubre de 2025. Concluida la celebración de dicha vista, el 30 de enero de 2026, DACo notificó la *"Resolución"* que hoy nos ocupa. Mediante esta, declaró *Ha Lugar* la *"Querella"* presentada por el recurrido. En consecuencia, le ordenó a Auto Sales que reparara el motor del automóvil en disputa dentro de un plazo de treinta (30) días contados a partir de la notificación de la referida *"Resolución."* A su vez, determinó que Auto Sales debe pagar al recurrido la cantidad total de $11,339.00 en concepto de daños e indemnización por el tiempo de reparación del vehículo; más el interés legal; y una suma adicional a razón de $16.43 diarios de excederse el tiempo de reparación.

Además, DACo esbozó en su *"Resolución"* las siguientes determinaciones de hecho:

1. El día 3 de febrero de 2024, la parte querellante adquirió del dealer querellado, el vehículo de motor usado marca Infinity modelo Q508 del año 2019, con un millaje recorrido de 49,310 millas. El auto es uno deportivo con motor turbo.

2. Durante la compraventa, el querellante fue atendido por el Sr. Bartolo Ríos, Gerente del dealer querellado. Al momento de la compraventa, el Sr. Ríos le informó al querellante que el auto estaba en perfectas condiciones.

3. El precio del auto fue pactado en $28,000.00, cantidad que fue pagada por el querellante al querellado a través de cheque de gerente.

4.      El querellante tomó un préstamo para adquirir el auto, y paga $493.00 mensual de dicho préstamo.

5.      El querellado le otorgó una garantía al vehículo de tres meses o 3,000 millas lo que ocurriera primero.

6.      El querellante arregló "unos cantancitos" que tenía el auto y le dio un tratamiento a la pintura pagando $1,000.00 por todo.

7.      El día16 de marzo de 2024, en horas de la noche, la parte querellante conducía normalmente el vehículo de motor adquirido por la carretera, cuando sintió un ruido (tun) en el vehículo. En ese momento, el querellante se detuvo y se bajó del auto para ver que sucedía y pensó era la transmisión. El querellante vio que el auto estaba bien, que no se estaba calentando y que se movía, entonces procedió a conducir despacio hasta su residencia. Mientras conducía el vehículo, el querellante se percató que el auto se desaceleró o perdió un poco de fuerza.

8.      Al día siguiente, 17 de marzo de 2024, el querellante prendió el auto y rápidamente lo apagó, porque sonaba más fuerte.

9.      El 18 de marzo de 2024, el querellante se comunicó al dealer querellado para informar lo sucedido con el auto. El dealer querellado le indicó al querellante que le devolvería la llamada.

10.    Ante las llamadas del querellante al dealer para reclamar garantía, el querellado respondía que se comunicaría más tarde, sin embargo no se comunicaron con el querellante.

11.    El día 26 de marzo de 2024, la parte querellante presentó la querella de epígrafe.

12.    El día 28 de marzo de 2024, la parte querellada recogió, en servicio de grúa, el auto objeto de la querella en la residencia de la parte querellante. La parte querellada le indicó al querellante que el auto iría para el dealer.

13.    El 2 de abril de 2024, el dueño del dealer, el Sr. Alex Castillo, llamó al querellante desde el teléfono del Sr. Bartolo Ríos, para indicarle que se encontró mal uso del auto por el querellante, que era culpa del querellante. Para la fecha de la llamada, el auto aún no había sido diagnosticado.

14.    El querellado no le entregó al querellante una hoja de servicio detallando que luego de inspección y diagnóstico al auto se le denegaba la garantía por la razón expuesta por el Sr. Castillo en su llamada al querellante, que se encontró mal uso del auto por el querellante. Para este momento, el auto no había sido inspeccionado y diagnosticado aún.

15.    El querellado no le notificó al querellante donde se encontraba el auto, en todo momento el querellante creyó por las manifestaciones del querellado que el auto estaría en el dealer querellado. El 5 de abril de 2024, los padres del querellante se presentaron al dealer querellado para buscar información del auto, y descubrieron que el auto no estaba allí.

16.    El querellado no le informó al querellante donde ubicaba el auto.

17.    Entre el 6 de abril al 10 de mayo  de 2024, el querellante se dedicó a buscar donde estaba el auto. Por diferentes mecánicos averiguó que el auto estaba en un taller de Coamo.

18. Para el 10 de mayo de 2024, el querellante ubicó su auto en el taller Mickey Boats Auto & Truck Service en el pueblo de Coamo, el vehículo se encontraba estacionado en un terreno con vegetación a la intemperie sin carpa ni protección.

19. EL Sr. Miguel Muñoz Lizardi, es el dueño del taller Mickey Boats Auto & Truck Service, quien mantiene contrato de servicios con el querellado para inspeccionar y reparar autos provenientes del dealer querellado desde hace 9 años.

20. El día 17 de abril de 2024, la parte querellante presentó la querella de epígrafe.

21. La parte querellada llevó el auto al taller de Miguel Muñoz aproximadamente para principios de mayo de 2024, porque el mismo presentaba un ruido en el motor, para que verificara lo que tenía el auto.

22. A las dos o tres semanas de haber recibido el auto, el Sr. Muñoz abrió el motor del auto para inspeccionar el mismo. Antes de abrir el motor, el Sr. Muñoz prendió el auto y escuchó un ruido en el motor.

23. Al abrir el motor, el Sr. Muñoz encontró que el motor estaba limpio, el aceite limpio, leve brillo, desmontó el crank del motor y sacó todas las bielas, encontrando que el bearing de la biela #5 estaba lastimada.

24. El Sr. Muñoz dispuso del aceite de motor, dejó la tapa crank fuera y todas las bielas desmontadas y colocadas dentro del auto. El Sr. Muñoz al sacar el oil cooler no observó mezcla de aceite con cooler, el Sr. Muñoz dispuso de estos antes de la inspección del DACO.

25. El Sr. Muñoz le colocó el "scanner" al auto, sin embargo en ese momento no reflejó código.

26. Luego del diagnóstico del Sr. Muñoz, el querellado no le entregó al querellante una hoja de servicio detallando que luego de inspección y diagnóstico al auto se le denegaba la garantía y exponiendo la razón para ello.

27. El 18 de junio de 2024, la parte querellante enmendó la querella de epígrafe.

28. Ese día 12 de febrero de 2024, este Departamento llevó a cabo una inspección del auto en controversia, por conducto del Técnico Automotriz del DACo de la Regional de San Juan el Sr. José Torrón Martínez, en las instalaciones del taller de Mickey Boats Auto & Truck Service en Coamo.

29. El día 15 de marzo de 2024, el Técnico emitió el informe en el cual señaló entre otras cosas los siguiente: "Resultados de inspección *Condiciones del vehículo según alegaciones de la querella*:

MAY-2024-0005077- El vehículo estaba en poder del querellado y el lugar donde citaron aparentemente es el de un servicio prestado del querellado ya que al llegar estaba presente el director de flota Bartolo Ríos por la parte querellada. El vehículo que posee arquitectura deportiva y lujosa presentó tener la batería de 12 voltios agotada sin carga energética. Propuse que adhirieran corriente con cables portátiles desde un carro a otro porque no había equipo eléctrico para suministrar carga eléctrica. El sistema de enfriamiento no tenía fluido anticongelante en el motor de combustión. Solicite[sic] que aplicaran corriente para poder colectar el millaje en el odómetro. También solicite[sic] una evaluación electrónica "D.T.C. Diagnostic Trouble Code" pero el

querellado me dejo[sic] saber que no se puede por la razón de que el presidente del taller no estaba presente al momento de la inspección porque tuvo una emergencia médica. Él es el que tiene poder del acceso al equipo "Scanner" en el taller. "El objetivo de citar la inspección en un taller es que se requiere equipo para evaluar y hacer estudios y análisis del vehículo de la querella y deben tener la mejor cooperación con el inspector". El vehículo lo tenían elevado en un pino hidráulico de taller ya abierto en el área del cartel con componentes del cigüeñal desmontados. Observé que la muñequita del cigüeñal número de pistón cinco mostraba desgaste de aleación en el laminado de la superficie donde no encontré Prismatización por falta de lubricación en altas revoluciones generando alta fricción. De lo contrario fue un desgaste "Dry Skin"2 en la muñequita del pistón número cinco en el cigüeñal. Este motor lo encontré inmaculado sin sedimentación de "Sludge" en su mantenimiento del sistema de lubricación. También no encontré barniz lo que es indicativo que no estaba corriendo con fluido lubricante con base de petróleo. El que requiere el fabricante es base sintética la cual no crea barniz. Observe una de las guías de la cadena de tiempos que va por área del cigüeñial y la observe en orden sin fisuras, marcas de rasgaduras en la superficie y no estaba amarillenta o ámbar por fricción. El querellado me mostro el aparentemente cartel del motor ya desinstalado abajo en el piso y observé el cedazo sin partículas grandes, pero si encontré esmeril arenoso y oscuro en el piso del cartel.

Opinión

*Opinión del perito*

- Entreviste[sic]  al querellante y me dejo[sic]  saber que una de las quejas era que el motor estaba sonando.

- La evaluación del odómetro no se pudo realizar por la razón de que hacía falta un "Scanner" donde se observaría el odómetro en el panel de instrumentación y ver si concuerda con el del sistema operativo electrónico "O.B.D.II On Board Diagnostic" del vehículo.

- La avería se mostró en la muñequita del cigüeñal en el pistón cinco y no mostraba colores prismáticos. El desgaste se observó en seco "Dry Skin".

- La guía de la cadena de tiempos en el área del cigüeñal la encontré en orden.

- No se pudo hacer una evaluación electrónica ya que los técnicos independientes tampoco poseían "Scanners" adecuados para la evaluación "D.T.C." y poder extraer códigos.

    - En la extracción de códigos es más precisa para una evaluación más exacta.

    - De surgir códigos de temperatura o tiempo del motor también se le podría adjudicar razones del defecto, pero sería especulativo ya que la prueba científica del escaneo como protocolo de evaluación no se realizó.

- Observación del buñuelo o muñequita desgastado en el cigüeñal. Este desgaste fue por falta del laminado del fluido lubricante del motor estando en fr[í]o.

    - Posibles causas

1 - Uso del vehículo indebido cuando este tiene mezcla de "coolant y aceite" en la cual rasga el Buñuelo o Muñequita del cigüeñal.

2 - Si el motor estando en receso de un día para el otro, si lo prenden llevándolo a una aceleración de extremas revoluciones haciendo un "W.O.T. Wide Open Trotter" puede causar dicha avería en el cigüeñal. El fluido lubricante no está a su temperatura ideal.

Estimado

*Costos de reparación*

General Diagnosis
$102 to $130
Cost Breakdown
Labor (100%)
Parts (0%)
This estimate does not account for taxes, diagnostics, and other fees.
SERVICE SUMMARY
2019 INFINITI Q50
00769- Coamo, PR

General Diagnosis"

30. La parte querellante objetó el informe de inspección.


31. La parte querellada objetó el informe de inspección.

32. El día 10 de octubre de 2025, se celebró la primera vista administrativa de la presente querella.

33. Durante la vista administrativa, el Técnico Automotriz del DACO, José Torrón declaró: que su opinión se basó en la observación ya que no contaban con scanner para llevar a cabo una determinación científica de la causa del fallo del motor, que el escaneo es un complemento de la observación, y que el scanner puede ser mejor prueba, sin embargo en el caso de lubricación se puede apreciar visualmente.

34. El Sr. Torrón basó su opinión pericial en lo observado en el lugar, por su experiencia y conocimiento.

35. El Sr. José Torrón declaró:

- Que al momento de hacer la inspección del auto encontró que la tapa del crank estaba sin aceite,

- La biela #5 estaba fuera y presentaba "dry skin" (que le faltó lubricación)

- Que no se llevó a cabo una prueba de OBDC (para conocer la determinación científica de la causa del fallo),

- Que la mejor prueba científica es con el scanner,

- Que no es confiable el resultado de la inspección, porque faltó el estudio científico con el OBD2, ya que el scanner es un complemento de la observación para llevar a cabo un "overall" de la situación,

- Que no hay prueba de sustitución de bielas, no se puede establecer que se sustituyó el cigüeñal,

- Si se parte la cadena de tiempo puede afectar la lubricación, sin embargo no hay evidencia de cadena de tiempo partida,

- Como posible causa, que estando el motor en frío, hubo un desgaste que provocó problema en el pistón 5,

- Que el motor estaba limpio y clarito,

- Que no habían color prismático que es indicativo de calentamiento de motor por falta de lubricación,

- Que el motor no sufrió sobrecalentamiento,

- Que el motor tenía buen mantenimiento,

- Que no observó "melcocha" de aceite y coolant, que al llevar a cabo la inspección ya se había dispuesto del aceite y del coolant,

- Que la mejor evaluación para saber si el motor sufrió un sobre calentamiento o sobre giro es la prueba científica.

36. El Sr. Torrón usó la siguiente descripción para manifestar una de sus opiniones: "A pata pesá" lo llevaron a alta temperatura y no permitió llevar la lámina de lubricación, porque se llevó a alta revolución. Además declaró, como posible causa, que estando el motor en frío le "metieron una acelerá".

37. El Técnico Torrón declaró, que la escena encontrada en el taller, donde se encontraron piezas fuera y el motor abierto no era confiable.

38. A preguntas de los representantes legales de las partes, el Sr. Torrón declaró que no sabe si el motor fue manipulado.

39. El Sr. Torrón no tiene certeza de lo que le ocurrió al motor, son posibles causas.

40. El Sr. Marcos Martínez Vera, Técnico Automotriz, declaró en la vista administrativa del día 22 de octubre de 2025, en calidad de perito de la parte querellada. Su declaración se basó en las observaciones de la inspección del auto llevado a cabo por el DACO.

41. Declaró el Sr. Martínez Vera, que observó que no se detectó contaminación de aceite con agua o coolant en el motor del vehículo del querellante y que el motor se veía limpio.

42. Declaró el Sr. Martínez, que a base de la observación visual en la inspección del DACO, se puede concluir que hubo un desgaste excesivo del cigüeñal #5, producido por ausencia de lubricación, (falta de aceite). Además, declaró el Sr. Martínez, que por experiencia este concluye que el motor sufrió un sobregiro en las revoluciones por minuto, exceso de revoluciones, donde se sobre acelera el motor poniendo el pedal hasta el final o reduciendo velocidad bruzca de la transmisión.

43. El Sr. Martínez no llevó a cabo ninguna prueba en el motor.

44. El Sr. Martínez no estuvo presente en la inspección llevada a cabo por el Sr. Miguel Muñoz, en el taller de Coamo.

45. No hay evidencia de que el vehículo haya tenido problemas con la cadena de tiempo ni bomba de aceite.

46. La parte querellada no le entregó al querellante una hoja de servicio detallando las razones por las cuales se denegó la garantía.

47. El querellante continuó pagando el préstamo del auto mientras este se encuentra en el taller Mickey Boats Auto & Truck Service en el pueblo de Coamo.

En desacuerdo, oportunamente el 1 de marzo de 2026, Auto Sales presentó un recurso de revisión judicial ante este Tribunal. Mediante este, esbozó el siguiente señalamiento de error:

Erró el DACo al aplicar el derecho en la Resolución recurrida pues de una lectura de sus propias determinaciones de hechos surge con meridiana claridad que las conclusiones de derecho están en conflicto con los hechos, según encontrados probados por la Agencia.

El 4 de marzo de 2026, ese Tribunal notificó una *"Resolución"* mediante la cual le concedimos al recurrido el término reglamentario de treinta (30) días para presentar su alegato en oposición al recurso de epígrafe. Además, ordenamos que se presentara copia certificada del expediente administrativo de este caso.

Así pues, el 25 de marzo de 2026, el recurrido presentó su alegato en oposición. Por su parte, el 1 de abril de 2026, DACo presentó *"Moción Sometiendo Copia Certificada del Expediente Administrativo."*

Con el beneficio de la comparecencia de ambas partes, procedemos a esbozar el marco jurídico aplicable al asunto ante nuestra consideración.

**II.**

**A.     Revisión Judicial de las Decisiones Administrativas**:

La revisión judicial de determinaciones administrativas está limitada por los parámetros establecidos en la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 L.P.R.A. sec. 9671-977. De ordinario, esta tiene lugar luego de que se adjudican las controversias pendientes ante una agencia y concluyen todos los trámites administrativos. *Miranda Corrada v. DDEC et al.*, 211 DPR 738, 746 (2023).

Las determinaciones de las agencias administrativas son revisables ante el foro judicial para garantizar que estas actúan dentro de marco de las facultades que les fueron delegadas por ley. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* 213 DPR 743, 753 (2024); *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022). De esta manera, los ciudadanos tienen un foro al cual

recurrir para vindicar sus derechos y obtener un remedio en los casos en que las agencias actúen de forma arbitraria. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 753. La revisión judicial de una decisión administrativa se circunscribe a examinar lo siguiente: 1) si el remedio concedido por la agencia fue el apropiado; 2) si las determinaciones de hecho realizadas por la agencia estuvieron sustentadas por la prueba sustancial que surgió del expediente administrativo; y 3) si, mediante una revisión completa y absoluta, las conclusiones de derecho fueron correctas. *Otero Rivera v. USAA FED. SAVS. BANK,* 214 DPR 473, 484-485 (2024).

En el escenario particular de las cuestiones de derecho, el Tribunal Supremo ha proferido las siguientes expresiones:

> Hoy hacemos eco a las palabras del foro federal y concluimos que la interpretación de la ley es una tarea que corresponde inherentemente a los tribunales. Así, enfatizamos la necesidad de que los foros judiciales, en el ejercicio de su función revisora, actúen con el rigor que prescribe la LPAU, supra. Como corolario, al enfrentarse a un recurso de revisión judicial proveniente de una agencia administrativa, será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos. No guiados por la deferencia automática a la que alude el DACo, sino que por los mecanismos interpretativos propios del Poder Judicial. *Vázquez y otro v. Consejo de Titulares y Junta de Directores del Condominio Los Corales y otros,* 2025 TSPR 56.

Cabe resaltar, que en el ejercicio de revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia administrativa. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 754. Antes de variar la referida decisión se debe examinar la totalidad del expediente y "determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba." *Íd.* A su vez, las decisiones administrativas se deben evaluar bajo el marco de la deferencia, por razón de la experiencia y pericia de dichas agencias respecto a las facultades que se le han delegado. *Batista, Nobbe v. JTA. Directores,* 185 DPR 206, 215 (2012).

En consideración a la aludida deferencia, se ha establecido que "las decisiones de las agencias administrativas tienen una presunción de legalidad y corrección que los tribunales deben respetar mientras que la

parte que las impugna no produce suficiente evidencia para derrotarlas." *Batista, Nobbe v. JTA. Directores*, supra, pág. 215. A la luz de ello, la parte que impugne una decisión administrativa tiene el peso de la prueba para demostrar que esta no se sustenta en el expediente administrativo o que las conclusiones a las cuales llegó la agencia son irrazonables. *OEG v. Martínez Giraud*, supra, pág. 89.

**B.     Reglamento de Garantías de Vehículos de Motor, Reglamento Núm. 7159 de 6 de junio de 2006 ("Reglamento Núm. 7159"):**

El Reglamento Núm. 7159 aplica a toda persona natural o jurídica que se dedica a la venta y servicios de vehículos de motor nuevos o usados en Puerto Rico. Véase, Regla 3 del Reglamento Núm. 7159, *supra*. Este Reglamento persigue los siguientes propósitos:

a.     Proteger adecuadamente a los consumidores y sus inversiones en la adquisición de vehículos de motor.

b.     Procurar que todo consumidor que compre un vehículo de motor en Puerto Rico, le sirva para los propósitos que fue adquirido, y que reúna las condiciones mínimas necesarias para garantizar la protección de su vida y propiedad.

c.     Prevenir las prácticas ilícitas en la venta de vehículos de motor en Puerto Rico. Véase, Regla 2 del Reglamento Núm. 7159, *supra*.

Cabe resaltar, que las presentes disposiciones reglamentarias deben interpretarse liberalmente a favor del consumidor. Véase, Regla 4 del Reglamento Núm. 7159, *supra*. En lo que concierne a la garantía de los vehículos de motor, la Regla 5 del referido Reglamento define el "Certificado de garantía" como aquel "[d]ocumento que expide el fabricante o vendedor, mediante el cual se obliga a responder por desperfectos, vicios o cualquier deficiencia que los vehículos puedan presentar dentro de un periodo de tiempo y millaje determinado. Incluye las responsabilidades del comprador." El concepto de "desperfectos" hace referencia a aquellas "faltas que exceden las imperfecciones que cabe normalmente esperar en un vehículo de motor." *Id.* "No es requisito que dichos desperfectos imposibiliten el uso del vehículo de motor, siempre que mermen notablemente su valor, uso y/o seguridad." *Id.*

Es responsabilidad del vendedor de un vehículo de motor entregar al comprador el aludido certificado de garantía, al momento en que se entrega el referido vehículo. Véase, Regla 7 del Reglamento Núm. 7159, *supra*. Asimismo, la Regla 10 de este Reglamento establece lo siguiente:

> Cuando el fabricante, distribuidor o concesionario, vendedor de **un vehículo de motor nuevo o usado**, **se niegue a honrar la garantía o alguna parte de ésta** bajo el fundamento de que el consumidor incumplió las condiciones impuestas en la misma, **deberá entregar a éste por escrito las razones específicas por las cuales entiende estar relevado de su obligación**. (Énfasis suplido).

Es meritorio señalar, que se prohíbe vender un vehículo de motor usado sin garantía. Véase, Regla 26.1 del Reglamento Núm. 7159, *supra*. Esta garantía será concedida en piezas y mano de obra, y a razón del millaje recorrido de escala siguiente:

> a).    Hasta 36,000 millas – cuatro (4) meses o cuatro mil (4,000) millas, lo que ocurra primero.
>
> b)    Más de 36,000 millas y hasta 50,000 millas – tres (3) meses o tres mil (3,000) millas, lo que ocurra primero.
>
> c)    Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos (2,000) millas, lo que ocurra primero. Regla 26.2, *supra*.

La garantía concedida deberá incluir, entre otras cosas, su duración; las partes o piezas garantizadas; la forma en que se puede reclamar; el nombre de quien tiene el deber de honrarla; una exposición clara y precisa de las circunstancias por las cuales el consumidor puede perder el derecho a reclamarla; y una exposición del derecho del consumidor a recibir transportación provista por el vendedor en los casos en que la reparación de la aludida unidad vehicular exceda los cinco (5) días de reparación. Véase, la Regla 27 del Reglamento Núm. 7159, *supra*.

Cabe resaltar, que todo agente de servicio autorizado debe cumplir con unos criterios normativos al momento en que un consumidor entregue su vehículo de motor para reparos o servicios. Ante ello, se desprende de la Regla 13.1 del precitado Reglamento que el concesionario debe entregar al consumidor "una declaración legible u orden de reparación que indique la fecha en que se ingresó el vehículo al taller, el millaje que tiene el vehículo, y las condiciones físicas de la unidad y los defectos informados

por el consumidor." Además, una vez el vehículo se haya inspeccionado o reparado el concesionario entregará al consumidor una declaración u orden actualizada y detallada con lo siguiente:

a.      Identificación del vehículo por marca, modelo, año, número de serie, color y número de tablilla.

b.      Una descripción detallada de los problemas informados por el consumidor.

c.      Cualquier prueba de manejo llevada a cabo y el tiempo aproximado de su duración.

d.      Cualquier diagnóstico realizado.

e.      Todo el trabajo efectuado en el vehículo de motor, las piezas y labor.

f.      La fecha y la lectura del odómetro cuando el vehículo de motor fue sometido para inspección o reparación y la fecha y la lectura del odómetro en que dicha inspección o reparación fue completada.

g.      El nombre y número de colegiación, calificación del técnico o mecánico que realizó la misma.

h.      Costo de la mano de obra y las piezas, por separado, cuando dicho costo no esté cubierto por la garantía.  Véase, Regla 13.2, *supra.*

**III.**

En su comparecencia, Auto Sales aduce que instó el presente recurso de revisión judicial para cuestionar la aplicación del derecho a los hechos de este caso y no las determinaciones de hecho expuestas por DACo. Entiende, que la decisión recurrida debe ser revocada, puesto que se probó que el desperfecto mecánico del automóvil objeto de litigio fue provocado por un mal uso del vehículo de motor y no debido a un defecto existente al momento de efectuarse la compraventa de dicho automóvil.

Por su parte, el recurrido argumenta que Auto Sales expuso un señalamiento de error que no contiene asuntos medulares que puedan ser legítimamente revisables por este Foro. Es por ello, que entiende que esta Curia debe decretar su falta de jurisdicción para atender en sus méritos el recurso de epígrafe. De otra parte, sostiene que debemos conceder deferencia a las determinaciones de hecho de DACo y confirmar la *"Resolución"* objeto de revisión. Ello, puesto que, el técnico automotriz de DACo identificó que el automóvil en disputa tenía desperfectos mecánicos

los cuales no fueron diligentemente atendidos por Auto Sales. Prueba de esto, según aduce, son los siguientes hechos: que Auto Sales no le entregó un informe formal de diagnóstico; no documentó adecuadamente la denegatoria de garantía; y trasladó el vehículo de motor a un taller sin informar su ubicación de forma oportuna.

Tras examinar los planteamientos de las partes y la documentación ante nuestra consideración, concluimos *confirmar* la decisión recurrida. Nos explicamos.

Según expuesto, al examinar un recurso de revisión judicial este Tribunal tiene el deber de evaluar si las determinaciones de hecho realizadas por la agencia se basan en prueba sustancial que obra en el expediente administrativo. Por otro lado, nuestro acercamiento revisor debe ser desde el marco de la deferencia a las decisiones administrativas, por la razón del conocimiento experto que cada agencia mantiene en el ejercicio de las facultades que le han sido legislativamente delegadas.

Así pues, surge de las determinaciones de hecho esbozadas por DACo, que el 3 de febrero de 2024, el recurrido compró a Auto Sales un automóvil usado. El referido vehículo se vendió al amparo de la garantía de tres (3) meses o 3,000 millas, lo que ocurra primero. Así las cosas, el 16 de marzo de 2024, el recurrido comenzó a percibir posibles desperfectos mecánicos en el automóvil. Las impresiones del recurrido fueron comunicadas a Auto Sales el día 18 del mismo mes y año. No obstante, no surge del expediente ante nos algún acto afirmativo por parte de Auto Sales dirigido a honrar la garantía del automóvil del recurrido. Tampoco se desprende, que Auto Sales le haya entregado al recurrido las razones escritas y específicas por las cuales considera que está relevado de honrar dicha garantía.

Por otro lado, el 2 de abril de 2024, el dueño del Concesionario le informó al recurrido que su vehículo sufrió un desperfecto mecánico debido a un mal uso. No surge de la documentación ante nuestra consideración, que antes de la aludida fecha se le hubiera entregado al recurrido una

declaración legible u orden de reparación, según contemplada en la Regla 13 del Reglamento de Garantías de Vehículos de Motor. De igual modo, no se desprende que a esa fecha el referido automóvil haya sido propiamente inspeccionado. Tampoco surge, que tras la ocurrencia de la inspección requerida Auto Sales haya preparado y entregado al recurrido una declaración u orden de reparación actualizada. Además, surge de las determinaciones de hecho, que el vehículo en cuestión fue trasladado por Auto Sales a un taller de reparación sin notificar al recurrido. En ese lugar se abrió el motor del automóvil a los fines de inspeccionarlo. Dicha inspección no pudo realizarse mediante prueba de "scanner."

Cabe destacar, que las determinaciones de hecho de DACo no fueron cuestionadas ni impugnadas por Auto Sales. La prueba pericial desfilada en el presente caso coincide en que el auto del recurrido sufrió un desperfecto mecánico y que este consiste en un desgaste del cigüeñal Núm. 5. Es meritorio destacar, que DACo emitió una *"Resolución"* bien fundamentada que tomó en consideración la totalidad de la prueba presentada por las partes y cada una de las circunstancias del caso de epígrafe. DACo concluyó, que no existe una causa cierta para el desperfecto mecánico que presenta el vehículo de motor del recurrido.

Algunos de los fundamentos que sostienen dicha conclusión son los siguientes: a) Auto Sales le comunicó al recurrido que había realizado un mal uso de su automóvil antes de que el vehículo fuera propiamente inspeccionado; b) la inspección del vehículo en controversia se basó en meras observaciones y no en una evaluación electrónica con "scanner;" c) Auto Sales no entregó una hoja de servicio al recurrido en la que se detalle la ocurrencia de la inspección y diagnóstico y las razones para denegar la garantía, si alguna; d) falta de confiabilidad en la forma en que el taller contratado por Auto Sales evaluó el vehículo del recurrido; y e) ausencia de confiabilidad en el hecho de que el automóvil en disputa permaneció en el aludido taller con el motor desarmado y con piezas fuera por espacio de ocho (8) meses.

Así pues, tras examinar las determinaciones de hecho expuestas por DACo, las cuales fueron aceptadas por Auto Sales, concluimos que las mismas están bien sustentadas y merecen nuestra deferencia. Nos corresponde ahora revisar las conclusiones de derecho vertidas en la *"Resolución"* recurrida. En esta labor judicial concluimos que la determinación objeto de revisión está legítimamente fundamentada en el Reglamento de Garantías de Vehículos de Motor, *supra*. El referido Reglamento contempla disposiciones que deben interpretarse de forma liberal a favor del consumidor.

Surge de dicho Reglamento la prohibición expresa de vender vehículos de motor usados sin garantía. El concesionario o vendedor debe honrar esta garantía a menos que entienda que el consumidor incumplió con sus condiciones. Sin embargo, para que un concesionario o vendedor pueda denegar válidamente una garantía deberá exponer y entregar por escrito las razones que fundamentan la denegatoria. Asimismo, cuando un consumidor entregue su vehículo de motor para reparos o servicios, el concesionario debe, a su vez, entregar una declaración legible u orden de reparación. Esta debe incluir la fecha en que el vehículo de motor ingresó al taller, el millaje del automóvil, sus condiciones físicas y los desperfectos informados por el consumidor. Una vez se haya reparado o inspeccionado el automóvil el concesionario tiene el deber de actualizar la referida declaración u orden. Esta actualización deberá contener, entre otras cosas, el diagnóstico realizado y el trabajo efectuado.

En este caso, Auto Sales no cumplió con honrar o denegar la garantía del vehículo en controversia de la forma provista en el Reglamento de Garantías de Vehículos de Motor, *supra.* Tampoco entregó al recurrido una declaración u orden de reparación a tenor de las aludidas disposiciones reglamentarias. En vista de ello, la *"Resolución"* recurrida está correctamente fundamentada en derecho. Así pues, Auto Sales no logró rebatir la presunción de legalidad y corrección que reviste a la decisión de DACo.

**IV.**

Por las razones que anteceden, *confirmamos* la *"Resolución"* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones